**Brett GIBSON, Appellant–Plaintiff,**

v.

**Thomas A. NEU and Elizabeth A. Neu, Appellees–Defendants.**

**No. 49A02–0608–CV–680.**

Court of Appeals of Indiana.

May 30, 2007.

Sean M. Clapp, Fishers, IN, Attorney for Appellant.

Mark R. Galliher, Craig D. Doyle, Joanne B. Friedmeyer, James L. Shoemaker, Doyle & Friedmeyer, Indianapolis, IN, Attorneys for Appellees.

## OPINION

SHARPNACK, Judge.

Brett Gibson appeals the trial court's grant of a motion for summary judgment filed by Thomas A. Neu and Elizabeth A. Neu (the "Neus") and the trial court's denial of Gibson's motion for summary judgment. Gibson raises two issues, which we restate as:

I. Whether the trial court erred by ordering Gibson to release his mortgage on the Neus' property; and

II. Whether the trial court erred by applying the doctrine of equitable subrogation.

We affirm in part, reverse in part, and remand.

The relevant facts designated by the parties follow. On September 22, 2004, Gibson sold his stock of Cellular Telephone Centers T.H., Inc. to John Nowak for $350,000.00. In exchange for the stock, Nowak executed a promissory note payable to Gibson in the amount of $350,000.00. The note required Nowak to pay monthly installments of $7,000.00 "commencing on the 1st day of December, 2004 and continuing on the same day of each month thereafter with a final balloon payment due September 1, 2007." Appellant's Appendix at 149. The note also provided:

> Failure to make any payment as scheduled above shall advance the due date of all remaining payments to the date of such default.
>
> Each party to this contract agrees to waive demand for payment, protest, or notice of protest, and the benefits of any valuation or appraisement law of Indiana. . . .
>
> This note is secured by certain real estate mortgages of even date herewith. Upon default in the payment of any monthly installment provided for herein, or upon default in the performance of any of the covenants or conditions contained in the mortgage securing said indebtedness, the entire unpaid principal and interest of this note shall, at the option of the holder hereof, thereupon immediately become due and payable, without notice, and said indebtedness may be collected and said mortgage foreclosed by appropriate proceedings in law or in equity. No delay on the part of the holder hereof in exercising said option shall operate as a waiver thereof, or preclude the exercise of such option at any time during the continuance of any such default.

*Id.* at 149–150.

The note was secured by mortgages on Nowak's residence at 9998 East Edgewood

Ave., Indianapolis, Indiana, in Marion County and his property in Michigan. Gibson's mortgage on the Marion County property provided:

> Mortgagor further expressly agrees that if default be made by him in the payment of indebtedness secured hereby, ... the whole of the indebtedness secured hereby with all interest thereon, at the option of the Mortgagee shall become forthwith due and payable, and this Mortgage may be foreclosed at any time thereafter.
>
> The omission on the part of the Mortgagee to exercise such option at any time or times shall not preclude Mortgagee from the exercise thereof upon any subsequent default or upon the subsequent happening of any of said contingencies.
>
> It shall not be necessary for the Mortgagee to give any notice of its intention to exercise said option at any time, such notice being expressly waived hereby by Mortgagor.
>
> \* \* \* \* \* \*
>
> It is expressly agreed that in the event the Mortgagor sells the real estate during the term of this mortgage the Mortgagee will execute a release of the mortgage provided that Mortgagor has not defaulted in his obligations to the mortgagor and is current in his payments.

*Id.* at 155–156. Gibson recorded the mortgage with the Marion County Recorder's Office. At that time, Nowak also had a first mortgage on the property with Irwin Mortgage Corporation ("Irwin").

Nowak made the following payments to Gibson: (1) $7,000.00 on December 7, 2004; (2) $3,500.00 on January 6, 2005; (3) $3,500.00 on January 7, 2005; (4) $6,500.00 on February 8, 2005; and (5) $7,000.00 on March 10, 2005. Without informing Gibson, Nowak sold his residence to the Neus

on March 11, 2005, for $600,000.00. As part of the transaction, Investors Titlecorp performed a title search on Nowak's property. Investors Titlecorp found Irwin's first mortgage on the property but failed to locate Gibson's mortgage. The Neus borrowed $200,000.00 from Washington Mutual Bank ("Washington Mutual") to finance the purchase and granted Washington Mutual a mortgage on the property. As part of the purchase, Nowak's first mortgage to Irwin in the amount of $506,016.34 was satisfied, and Nowak received $54,679.82 in cash.

Following the sale of his residence, Nowak continued to make payments to Gibson as follows: (1) $5,000.00 on April 7, 2005; (2) $2,000.00 on April 21, 2005; (3) $3,500.00 on May 24, 2005; and (4) $3,500.00 on June 17, 2005. Gibson filed a complaint for judgment on the promissory note and for foreclosure of his mortgage against Nowak, the Neus, and Washington Mutual on June 3, 2005. Nowak filed a petition for chapter 7 bankruptcy on October 14, 2005.

Gibson filed a motion for summary judgment arguing that Nowak was in default on the note, that he was entitled to foreclosure of his mortgage, and that his mortgage had priority over the Neus' mortgage with Washington Mutual. The Neus responded to Gibson's motion for summary judgment and filed their own motion for summary judgment. The Neus argued that Nowak was not in default on the note at the time he sold the property to the Neus or, alternatively, that Nowak was in substantial compliance, and that Gibson would have been required to release his mortgage. The Neus also argued that they had priority over Gibson's mortgage under the doctrine of equitable subrogation.

The trial court denied Gibson's motion for summary judgment and granted the

Neus' motion for summary judgment as follows:

\* \* \* \* \* \*

16. Prior to the sale of the Real Estate to the Neus, Nowak was no more than $500 behind on his monthly payments. Additionally, Gibson stated in writing on June 20, 2005, that Nowak was current on payments through June 1, 2005; and had been current on the payments through May 2005. (See email dated May 3, 2005, Gibson to John Boyd.)

17. Gibson was aware that Nowak intended to sell the Real Estate. The Gibson mortgage specifically provided that "[i]t is expressly agreed that in the event that Mortgagor [Nowak] sells the real estate during the term of this mortgage the Mortgagee [Gibson] will execute a release of the mortgage provided that Mortgagor has not defaulted on his obligations to the mortgagor and is current in his payments."

18. Gibson never notified Nowak that he was in default pursuant to the Gibson Note and Mortgage until this suit was filed.

19. On June 20, 2005, subsequent to the sale of the Real Estate to the Neus, Gibson sent an e-mail confirming that as of June 13, 2005, Nowak was current in his payments due under the Gibson note.

The Court hereby CONCLUDES:

1. There is no genuine dispute as to any material fact set out in the Neus' Brief and the matters designated, which support an entry of judgment. The Neus are entitled to judgment in their favor as a matter of law and against Plaintiff Gibson.

2. At the time of the sale of the Real Estate to the Neus, Nowak had substantially complied with the terms of the Gibson note and mortgage, being at least only $500 behind in his payments to Gibson.

3. Notice must be provided before a slight deviation in performance can be declared a default, and Gibson never provided any such notice to Nowak at or before March 11, 2005, when the Neus purchased the real estate.

4. Any default in Nowak's obligation to Gibson was cured when Nowak made the April 7, 2005, payment of $5,000, shortly after the sale of the Real Estate to the Neus.

5. As Gibson had not declared a default pursuant to the terms of the Gibson note and mortgage, and any default was subsequently cured by Nowak, Gibson is obligated to release his mortgage upon the Real Estate.

6. As the Gibson Mortgage should have been released either at the time of the closing or after the subsequent payment by Nowak, Gibson is barred from foreclosing his mortgage on the Neu real estate known as 9998 E. Edgewood, Indianapolis, Indiana.

7. At the closing, the Neus and Washington Mutual Bank paid off the prior recorded mortgage to Irwin Mortgage Corporation, which was senior to the Gibson mortgage.

8. Additionally, the Court finds, though other findings dispose of this litigation between Gibson and the Neus and Washington Mutual, that the Defendants would be entitled to assume the first lien position of Irwin Mortgage Corporation, in the amount of $506,016.34,

under the doctrine of equitable subrogation.

9. The Gibson mortgage was always junior to the Irwin Mortgage, and no harm would come to Gibson's lien position by the Neus (and their lender, Washington Mutual) attaining first lien status.

10. As a matter of law, the Neus and/or their agents were not culpably negligent in failing to discover the Gibson mortgage.

11. Gibson is hereby ordered to release his mortgage as it pertains to the Real Estate described hereafter, within thirty (30) days of the date of this entry. . . .

12. There is no just reason for delay and this judgment is a final judgment pursuant to Indiana Trial Rule 56(C).

Appellant's Appendix at 7–12.

Our standard of review for a trial court's grant of a motion for summary judgment is well settled. Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(c); *Mangold ex rel. Mangold v. Ind. Dep't of Natural Res.,* 756 N.E.2d 970, 973 (Ind.2001). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmovant. *Id.* Our review of a summary judgment motion is limited to those materials designated to the trial court. *Id.* We must carefully review a decision on summary judgment to ensure that a party was not improperly denied its day in court. *Id.* at 974.

Where a trial court enters findings of fact and conclusions thereon in granting a motion for summary judgment, as the trial court did in this case, the entry of specific findings and conclusions does not alter the nature of our review. *Rice v. Strunk,* 670 N.E.2d 1280, 1283 (Ind.1996). In the summary judgment context, we are not bound by the trial court's specific findings of fact and conclusions thereon. *Id.* They merely aid our review by providing us with a statement of reasons for the trial court's actions. *Id.*

I.

The first issue is whether the trial court erred by ordering Gibson to release his mortgage on the Neus' property. On this issue, the trial court found that, at the time of the sale, Nowak was only $500 behind in payments on the loan, that notice of default was required, that Nowak's default was cured with the next payment, and that Gibson should have released the mortgage at the time of closing or after the subsequent payment. On appeal, Gibson argues that, at the time of the sale, Nowak was in default under the note and mortgage by his failure to make full and timely payments, that Nowak was not entitled to notice under the note and mortgage, and that the doctrine of substantial performance does not apply to a note and mortgage.

 Resolution of this issue requires that we interpret the parties' mortgage. "It is well settled that a mortgage agreement is a contract." *Cobbum v. Ameritrust Nat. Bank, Michiana,* 580 N.E.2d 969, 971 (Ind.Ct.App.1991). "As such, the individual parties have a right to define their mutual rights and obligations." *Id.* "It is not within the province of this Court to make a new contract for the parties or to ignore or eliminate any provisions in the instrument." *Id.* "As is true in the interpretation of all written agreements, the language of the mortgage and supporting instruments, unless it is ambiguous, represents the intention of the parties and is controlling." *Merchants Nat. Bank &*

*Trust Co. of Indianapolis v. H.L.C. Enterprises, Inc.*, 441 N.E.2d 509, 513 (Ind.Ct. App.1982).

The parties' arguments relate to the following provision of the Gibson Mortgage:

It is expressly agreed that in the event the Mortgagor sells the real estate during the term of this mortgage the Mortgagee will execute a release of the mortgage provided that Mortgagor has not defaulted in his obligations to the mortgagor and is current in his payments.

Appellant's Appendix at 156. Thus, the issue is whether Gibson would have been required to execute a release of the mortgage at the time Nowak sold the property, which depends upon whether Nowak had defaulted on his obligations to Gibson and was current in his payments.

## A. *Was Nowak Current on His Payments?*

■ The promissory note required that Nowak pay $7,000.00 to Gibson on the first day of each month starting on December 1, 2004, with a final balloon payment due on September 1, 2007. Nowak sold the property to the Neus on March 11, 2005. It is undisputed that, at that time, Nowak had made the following payments to Gibson: (1) $7,000.00 on December 7, 2004; (2) $3,500.00 on January 6, 2005; (3) $3,500.00 on January 7, 2005; (4) $6,500.00 on February 8, 2005; and (5) $7,000.00 on March 10, 2005. Consequently, Nowak was $500.00 behind in his payments at the time of the sale to the Neus.

The trial court also found that "[a]ny default in Nowak's obligation to Gibson was cured when Nowak made the April 7, 2005, payment of $5,000, shortly after the sale of the Real Estate to the Neus." Appellant's Appendix at 10. However, the issue is whether Nowak was in default at the time he sold the property to the Neus, and he was.[1] Even the $5,000.00 payment in April did not bring Nowak current on his payments. At that point, he was $2,500.00 behind in his payments. The April 7, 2005, payment did not cure Nowak's default.

Lastly, the trial court found: "Gibson stated in writing on June 20, 2005, that Nowak was current on payments through June 1, 2005; and had been current on the payments through May 2005. (See email dated May 3, 2005, Gibson to John Boyd.)." Appellant's Appendix at 9. The email sent by Gibson to John Boyd on June 20, 2005, states: "John, Please put [Nowak] down for a $3,500.00 payment on 06/13/05. Please confirm that this brings him current through June 1." *Id.* at 139. The text of this email does not indicate that Nowak was current; rather, it is clear that Gibson was asking whether Nowak was current. Moreover, nothing in this email indicates that Nowak was current at the time he sold the property in March 2005. This email does not provide support for the Neus' argument that Nowak was current in his payments when he sold the property to them.

---

1. The Neus argue that "[t]he mortgage ... did not require Nowak to be current in his payments on the date of sale." Appellee's Brief at 8–9. According to the Neus, the "unambiguous contract language required Gibson to release the mortgage when Nowak became current in his March payments, which Gibson accepted several weeks after closing." *Id.* at 9. We disagree. The clear language of the contract required Gibson to execute a release if Nowak sold the property, was not in default, and was current in his payments. Moreover, even the April payments did not bring Nowak current in his payments. On February 8, 2005, Nowak was $500 behind in his payments, on March 10, 2005, he was $500 behind, on April 7, 2005, he was $2,500 behind, on April 21, 2005, he was $500 behind, on May 24, 2005, he was $4,000 behind, and by June 17, 2005, he was $7,500 behind.

## B. *Substantial Performance.*

Gibson argues that the trial court improperly applied the doctrine of substantial performance in determining that Nowak was current in his payments. The trial court found: "At the time of the sale of the Real Estate to the Neus, Nowak had substantially complied with the terms of the Gibson note and mortgage, being at least only $500 behind in his payments to Gibson." Appellant's Appendix at 10.

 The doctrine of substantial performance "applies where performance of a nonessential condition is lacking, so that the benefits received by a party are far greater than the injury done to him by the breach of the other party." *Dove v. Rose Acre Farms, Inc.*, 434 N.E.2d 931 (Ind.Ct. App.1982). In *Dove*, the employee was promised a $5,000 bonus if he completed certain construction work within ten weeks, worked at least five full days a week for the same ten weeks, and was not tardy or absent. *Id.* at 932. In the tenth week, the employee became sick due to strep throat and missed two days of work. *Id.* at 932–933. As a result, the employer refused to give the bonus to the employee. *Id.* at 933.

On appeal, we determined that the doctrine of substantial performance was not applicable because the employee violated an essential condition of the bonus agreement, i.e. the agreement's tardiness and absenteeism rules. *Id.* at 935. We noted "[i]t is difficult for plaintiff to extricate himself from the conditions of employment which he has voluntarily assumed, for even though the forfeiture provisions seem harsh, we can only interpret the contract which the parties have made." *Id.* at 934 (quoting *Muir v. Leonard Refrigerator Co.,* 269 Mich. 406, 257 N.W. 723, 724 (1934)). The employee willingly entered into the bonus arrangement, and "he must be held to have agreed to all of the terms upon which the bonus was conditioned. If the conditions were unnecessarily harsh or eccentric, and the terms odious, he could have shown his disdain by simply declining to participate, for participation in the bonus program was not obligatory or job dependent." *Id.* at 935. Consequently, we held that the employee was not entitled to recover any portion of the bonus. *Id.* at 936.

Similarly, here, timely payment of the debt was an essential condition of the promissory note, mortgage, and release provision of the mortgage. We are constrained to apply the agreement that the parties made. *Cobbum,* 580 N.E.2d at 971 ("It is not within the province of this Court to make a new contract for the parties or to ignore or eliminate any provisions in the instrument."). The release provision of the Mortgage required that Nowak be "current in his payments." Appellant's Appendix at 156. Nowak was not current in his payments at the time he sold the property to the Neus and was not current in his payments at any time thereafter. The doctrine of substantial performance does not apply in this situation.

## C. *Notice of Default.*

 The trial court found that "[n]otice must be provided before a slight deviation in performance can be declared a default, and Gibson never provided any such notice to Nowak at or before March 11, 2005, when the Neus purchased the real estate." Appellant's Appendix at 10. However, the promissory note and mortgage clearly do not require that Gibson provide notice of default to Nowak. The note provided:

> This note is secured by certain real estate mortgages of even date herewith. Upon default in the payment of any monthly installment provided for herein . . ., the entire unpaid principal and interest of this note shall, at the option of

the holder hereof, thereupon immediately become due and payable, without notice, and said indebtedness may be collected and said mortgage foreclosed by appropriate proceedings in law or in equity. No delay on the part of the holder hereof in exercising said option shall operate as a waiver thereof, or preclude the exercise of such option at any time during the continuance of any such default.

Appellant's Appendix at 149–150. Similarly, the Gibson Mortgage provided:

Mortgagor further expressly agrees that if default be made by him in the payment of indebtedness secured hereby, ... the whole of the indebtedness secured hereby with all interest thereon, at the option of the Mortgagee shall become forthwith due and payable, and this Mortgage may be foreclosed at any time thereafter.

The omission on the part of the Mortgagee to exercise such option at any time or times shall not preclude Mortgagee from the exercise thereof upon any subsequent default or upon the subsequent happening of any of said contingencies.

It shall not be necessary for the Mortgagee to give any notice of its intention to exercise said option at any time, such notice being expressly waived hereby by Mortgagor.

*Id.* at 155.

Under the plain language of the note and mortgage, Gibson was not required to give Nowak notice of default. *Cf. Dempsey v. Carter*, 797 N.E.2d 268, 273 (Ind.Ct. App.2003) (noting that the land contract contained a clause requiring notice of default and thirty days to cure a default), *trans. denied.*

### D. *Was Gibson Required to Release the Mortgage?*

As noted above, the mortgage provided that "in the event [Nowak] sells the real estate during the term of this mortgage [Gibson] will execute a release of the mortgage provided that [Nowak] has not defaulted in his obligations to [Gibson] and is current in his payments." Appellant's Appendix at 156. We need not address whether Nowak had "defaulted in his obligation" because he was not current in his payments at the time he sold the property to the Neus on March 11, 2005, and was consistently behind in his payments during the following months until he stopped making payments altogether after June 17, 2005. As a result, Gibson was not required to release the Gibson Mortgage. The trial court erred by denying Gibson's motion for summary judgment requesting foreclosure of the Mortgage. *See, e.g., Dempsey*, 797 N.E.2d at 274 (holding that the vendor was entitled to summary judgment because the evidence demonstrating default on the land contract by the purchaser was uncontroverted).

### II.

The next issue is whether the trial court erred by applying the doctrine of equitable subrogation. The trial court found that, even if Gibson was not required to release his mortgage, the Neus and Washington Mutual had priority over Gibson's mortgage in the amount of Irwin's mortgage based upon the doctrine of equitable subrogation.

In general, Indiana's recording statute, Ind.Code § 32–21–4–1, would resolve this issue. That statute provides:

A conveyance, mortgage, or lease takes priority according to the time of its filing. The conveyance, mortgage, or lease is fraudulent and void as against any subsequent purchaser, lessee, or

mortgagee in good faith and for a valuable consideration if the purchaser's, lessee's, or mortgagee's deed, mortgage, or lease is first recorded.

Ind.Code § 32–21–4–1(b). However, the Neus contend that the doctrine of equitable subrogation operates to give them and the $200,000.00 Washington Mutual mortgage priority despite the fact that Gibson's mortgage was recorded first. The trial court agreed and found that the Neus and Washington Mutual "would be entitled to assume the first lien position of Irwin Mortgage Corporation, in the amount of $506,016.34, under the doctrine of equitable subrogation." Appellant's Appendix at 11.

■ The classic formulation of the doctrine of equitable subrogation in the case of a purchaser of a note and mortgage for value is that the "purchaser's right of subrogation to the mortgage he or she discharged includes its priority over junior liens of which he or she did not have actual knowledge, [and] where he or she was not culpably negligent in failing to learn of the junior lien." *Bank of New York v. Nally*, 820 N.E.2d 644 (Ind.2005). Under this formulation, the Neus and Washington Mutual would be entitled to equitable subrogation if they discharged the entire Irwin mortgage, did not have actual knowledge of Gibson's mortgage, and were not

culpably negligent in failing to learn of Gibson's mortgage.[2] However, the Indiana Supreme Court revised this formulation in *Nally*.

There, the Owenses sold their property to the Nallys. *Id.* at 647. The Nallys executed a mortgage in the amount of $204,000.00 in favor of Amtrust Financial Services. *Id.* The Nallys also executed a promissory note and mortgage in the amount of $22,490.91 in favor of the Owenses. *Id.* When the Nallys divorced, Stephen Nally refinanced the Amtrust mortgage with EquiVantage, Inc. but increased the loan amount to $265,500.00. *Id.* Proceeds from the EquiVantage mortgage were used to pay off the Amtrust mortgage and various creditors but not the Owens mortgage. *Id.* EquiVantage's title search did not reveal the Owenses' mortgage. *Id.* The EquiVantage mortgage was then assigned to Bank of New York. *Id.* Bank of New York relied upon EquiVantage's title search. *Id.* A short time later, Bank of New York sued to foreclose its mortgage. *Id.* The Owenses contended that their mortgage was superior in priority to the Bank of New York's mortgage. *Id.* The trial court agreed and granted summary judgment to the Owenses. *Id.*

On appeal, the Indiana Supreme Court first held that EquiVantage and Bank of

---

**2.** In their Appellees' Brief, the Neus argue for the first time that they were entitled to summary judgment because Gibson's mortgage was defective and did not provide constructive notice. Specifically, the Neus argue that the notary's certificate was incomplete. Gibson argues in his reply brief that this issue is waived because the Neus did not present it to the trial court. We agree. The Neus have waived this issue. *See, e.g., Paramo v. Edwards*, 563 N.E.2d 595, 600 (Ind.1990) (holding that the appellee waived any argument regarding an alleged defective affidavit where the appellee did not make the argument in its motion for summary judgment despite the appellee's argument that a reviewing court is

bound to affirm a trial court's grant of summary judgment if sustainable on any theory or basis found in the record); *McGill v. Ling*, 801 N.E.2d 678, 687 (Ind.Ct.App.2004) (holding that a party may not raise an issue on appeal that was not raised to the trial court, even in summary judgment proceedings), *reh'g denied, trans. denied.* Consequently, there is no dispute that the Neus and Washington Mutual had constructive knowledge, but not actual knowledge, of Gibson's mortgage. *See Nally*, 820 N.E.2d at 648 ("A mortgage provides constructive notice to subsequent purchasers when it is properly acknowledged and recorded.").

New York had constructive notice of the Owenses' mortgage. *Id.* at 651. Next, the court addressed the Bank of New York's argument that its mortgage was entitled to priority over the Owenses' mortgage based upon the doctrine of equitable subgrogation. *Id.* The court noted that:

> Subrogation arises from the discharge of a debt and permits the party paying off a creditor to succeed to the creditor's rights in relation to the debt. It "arises by operation of law, that is to say it is created by the legal consequences of the acts and relationships of the parties, and thus is a legal fiction." In the case of a purchaser of a note and mortgage for value, the classic formulation is that the "purchaser's right of subrogation to the mortgage he or she discharged includes its priority over junior liens of which he or she did not have actual knowledge, [and] where he or she was not culpably negligent in failing to learn of the junior lien." The Court of Appeals has described the doctrine as "a highly favored doctrine, which is to be given a liberal application." Equitable subrogation requires the subrogee to discharge the entire debt held by the original obligor. Partial subrogation to a mortgage is not permitted because it "would have the effect of dividing the security between the original obligee and the subrogee, imposing unexpected burdens and po-

tential complexities of division of the security and marshalling upon the original mortgagee."

*Id.* at 651–652 (internal citations omitted).

The court first addressed whether actual or constructive notice of the Owenses' mortgage would bar the application of equitable subrogation. *Id.* at 652. The court noted that the Restatement (Third) of Property: Mortgages § 7.6 states that neither actual nor constructive notice of the preexisting junior lien is a bar to the equitable remedy of subrogation.[3] *Id.* Although prior Indiana Court of Appeals opinions had declined to use the Restatement's approach, *see Osterman v. Baber*, 714 N.E.2d 735, 739 (Ind.Ct.App.1999), *trans. denied,* the court disagreed and noted that the purpose of equitable subrogation is "to avoid an unearned windfall." *Id.* at 652–653. Other equitable considerations include the absence of any prejudice to the interests of junior lienholders. *Id.* at 653. The court noted that "[n]either negligence nor constructive notice of an existing lien is relevant to whether the junior lien holder will be unjustly enriched or prejudiced." *Id.* Rather, the basis for subrogation in this context is "the lender's justified expectation of receiving [a] security interest in the property." *Id.* (quoting 2 Grant S. Nelson & Dale A. Whitman,

---

**3.** Section 7.6 of the Restatement (Third) of Property: Mortgages provides:

(a) One who fully performs an obligation of another, secured by a mortgage, becomes by subrogation the owner of the obligation and the mortgage to the extent necessary to prevent unjust enrichment. Even though the performance would otherwise discharge the obligation and the mortgage, they are preserved and the mortgage retains its priority in the hands of the subrogee.

(b) By way of illustration, subrogation is appropriate to prevent unjust enrichment if the person seeking subrogation performs the obligation:

(1) in order to protect his or her interest;

(2) under a legal duty to do so;

(3) on account of misrepresentation, mistake, duress, undue influence, deceit, or other similar imposition; or

(4) upon a request from the obligor or the obligor's successor to do so, if the person performing was promised repayment and reasonably expected to receive a security interest in the real estate with the priority of the mortgage being discharged, and if subrogation will not materially prejudice the holders of intervening interests in the real estate.

*Real Estate Finance Law* § 10.6, at 15–16 (4th ed.2002)).

Perhaps the case occurring most frequently is that in which the payor [i.e. the party asserting a right to equitable subrogation] is actually given a mortgage on the real estate, but in the absence of subrogation it would be subordinate to some intervening interest, such as a junior lien. Here subrogation is entirely appropriate, and by virtue of it the payor has the priority of the original mortgage that was discharged. This priority is often of critical importance, since it will place the payor's security in a position superior to intervening liens and other interests in the real estate. The holders of such intervening interests can hardly complain of this result, for it does not harm them; their position is not materially prejudiced, but is simply unchanged.

*Id.* (quoting Restatement (Third) of Property: Mortgages § 7.6 cmt. e).

Ultimately, the court agreed with the Restatement's position on actual or constructive notice "at least in the context of a conventional refinancing." *Id.* The court held:

A lender providing funds to pay off an existing mortgage expects to receive the same security as the loan being paid off. Refinancings are commonplace in today's economy. Permitting a junior lienholder to leapfrog the priority of the current senior mortgage would impair the owner's access to more favorable interest rates. Unless a junior lienholder is disadvantaged by permitting subrogation, we see no reason to give the junior lienholder in effect the right to block or object to the refinancing. We conclude that a mortgagee who refinances an existing mortgage is entitled to equitable subrogation even if it had actual or constructive knowledge of an existing lien on the property unless the junior lienholder is disadvantaged or the mortgagee is "culpably negligent" . . ., but this remedy is subject to the rights and limitations of the subrogor.

*Id.* at 653–654.

As for culpable negligence, the court concluded that EquiVantage was "negligent in failing to discover the Owens mortgage which was recorded and noted in the mortgagor-mortgagee index before the deed to Mr. and Mrs. Nally was recorded. However, this error does not rise to the level of culpability." *Id.* at 655. Moreover, the court noted that the important factor in determining whether to apply equitable subrogation was "not the degree of negligence by the lender." *Id.* at 654. Rather, "[t]he key to subrogation . . . is an equitable result." *Id.* at 655. The court determined that "[e]quity should not allow the Owens mortgage to gain an unexpected elevated priority status because of the negligence of EquiVantage or its assignee that did the Owens no harm." *Id.*

Consequently, the court concluded that Bank of New York was entitled to equitable subrogation over the Owens' mortgage to the extent of the Amtrust mortgage. *Id.* at 654–655. However, "[t]o allow subrogation to apply to amounts in excess of the obligation under the Amtrust mortgage would place the Owens mortgage in a worse position than it held before refinancing." *Id.* at 654. The court noted that "[o]f the proceeds from the EquiVantage mortgage $63,176.96 went into Nally's pocket or was used to pay off other Nally creditors." *Id.* As a result, "EquiVantage [was] entitled to no better priority status than whatever priority those creditors held with regard to the Owens mortgage." *Id.*

The trial court here concluded that the Neus and Washington Mutual were entitled to equitable subrogation in the amount of the Irwin Mortgage, $506,016.34. Thus,

the trial court allowed the Neus and the Washington Mutual mortgage priority over Gibson's earlier recorded Mortgage. Gibson argues that the trial court erred because: (1) equitable subrogation applies only to refinance situations; (2) the Neus and Washington Mutual were volunteers; (3) the Neus had no expectation of a security interest; and (4) the result is inequitable.

## A. Application to Refinance Situations Only.

■ First, we must disagree that equitable subrogation applies only in refinance situations. In support of this argument, Gibson relies upon the Indiana Supreme Court's holding in *Nally* that "at least in the context of a conventional refinancing" a lender's actual or constructive knowledge of an existing lien on the property was irrelevant "unless the junior lienholder is disadvantaged or the mortgagee is 'culpably negligent.'" *Id.* at 653–654. Generally, the subrogor's knowledge has been relevant in determining whether to apply equitable subrogation. *See Id.* at 651 (noting that the classic formulation of the doctrine of equitable subrogation is that the "purchaser's right of subrogation to the mortgage he or she discharged includes its priority over junior liens of which he or she did not have actual knowledge, [and] where he or she was not culpably negligent in failing to learn of the junior lien"). However, *Nally* held that knowledge was irrelevant in a conventional refinancing situation. Thus, the court in *Nally* did not limit equitable subrogation to refinancing situations; rather, the court limited the relevancy of the lender's knowledge in refinance situations.

Additionally, we note that the court looked favorably upon the Restatement's position that "neither actual nor constructive notice of the preexisting junior lien is a bar to the equitable remedy of subrogation." *Id.* at 653. In fact, the court found that "[p]recluding equitable subrogation when a mortgagee discovered or could have discovered a junior lien holder runs contrary to the purposes underlying the doctrine" and that "[n]either negligence nor constructive notice of an existing lien is relevant to whether the junior lien holder will be unjustly enriched or prejudiced." *Id.* Thus, while it is clear from *Nally* that a lender's knowledge is irrelevant in the context of a traditional refinancing, *Nally* also implies that knowledge may be irrelevant in other contexts. Regardless, here, it is undisputed that the Neus and Washington Mutual had constructive, but not actual, knowledge of Gibson's mortgage. *Cf. Osterman,* 714 N.E.2d at 739–740 (holding that a lender was not entitled to equitable subrogation where it had actual knowledge of the junior lien).

## B. Volunteers.

■ Second, Gibson argues that the Neus and Washington Mutual were volunteers because they had no legal duty to purchase the property from Nowak or enter into the loan transaction. Equitable subrogation is applicable when a "party, not [acting as] a mere volunteer, pays the debt of another which, in good conscience, should have been paid by the one primarily liable." *Osterman,* 714 N.E.2d at 737. In general, "a person having a direct interest in the discharge of the debt or lien is not a volunteer." 73 AM.JUR.2D Subrogation § 20 (citing in part *Smart v. Tower Land and Inv. Co.,* 597 S.W.2d 333 (Tex.1980), for the proposition that a purchaser of property at a foreclosure sale is not a volunteer). The Neus and Washington Mutual did not voluntarily pay Nowak's debt to Irwin Mortgage; rather, they had a direct interest in paying the Irwin mortgage to protect their rights to the property. Moreover, in support of his argument

that the Neus and Washington Mutual were volunteers, Gibson relies upon cases from other jurisdictions. *See* Appellant's Brief at 21–24 (citing *Fidelity & Deposit Co. of Maryland v. Vance*, 135 Okla. 24, 245 P. 578 (Okla.1926), and *Southwest Title & Trust Co. v. Norman Lumber Co.*, 441 P.2d 430 (Okla.1968)). Gibson cites no Indiana authority for this proposition, and based upon Indiana precedent, we conclude that neither the Neus nor Washington Mutual were volunteers. *See, e.g., Nally*, 820 N.E.2d at 655 (holding that a refinancer's mortgage lender was entitled to the application of equitable subrogation).

## C. *Expectation of a Security Interest.*

■ Next, Gibson argues that the Neus had no expectation of a security interest. The only Indiana case to discuss this concept is *Nally*, where the Indiana Supreme Court noted that a basis for subrogation was "the lender's justified expectation of receiving [a] security" interest in the property. *Nally*, 820 N.E.2d at 653. It is undisputed that, although Washington Mutual would have had an expectation of receiving a security interest, the Neus had no such expectation. However, *Nally* makes it clear that "application of the doctrine of equitable subrogation depends on the equities and attending facts and circumstances of each case." *Nally*, 820 N.E.2d at 654. The expectation of a security interest is just one factor in determining whether to apply equitable subrogation.

## D. *Equities.*

■ Lastly, Gibson argues that the equities do not favor application of equitable

subrogation in this case. Rather than focus upon a party's culpable negligence and knowledge of the junior lien, the court in *Nally* identified several equitable factors to consider in determining whether equitable subrogation applies. One equitable factor was expectation of security, which we discussed above.

Another factor was prejudice to the parties. Here, subrogation would place Gibson in the same position as he was in prior to the sale to the Neus. When he placed the mortgage on the property, Gibson had a mortgage second in priority to Irwin's $506,016.34 mortgage. Allowing the Neus and Washington Mutual to be equitably subrogated to the extent of the Irwin mortgage would place Gibson in the same position as before the sale, and he would not be prejudiced. In fact, denying the Neus and Washington Mutual equitable subrogation would result in a windfall to Gibson.

Gibson argues that the Neus and Washington Mutual would not be prejudiced by awarding his mortgage first priority because they had title insurance. *See, e.g., Wilshire Servicing Corp. v. Timber Ridge Partnership*, 743 N.E.2d 1173, 1179–1180 (Ind.Ct.App.2001) (holding that the fact that "a title insurer was paid to perform precisely the function that would have revealed the junior judgment lien is a factor within the purview of a determination of the equities"). As it relates to Washington Mutual, this issue is addressed in Ind.Code § 32–29–1–11, which provides: [4]

> (d) Except for those instances involving liens defined in IC 32–28–3–1 [mechanic's liens], a mortgagee seeking

4. Ind.Code § 32–29–1–11 was added by Pub.L. No. 2–2002, § 14 (eff. July 1, 2002), and amended by Pub.L. No. 122–2003, § 1 (eff. July 1, 2003), which added new subsections (d) and (e), and Pub.L. No. 151–2003,

§ 2 (eff. July 1, 2003), which added new subsection (d). Effective April 25, 2005, Pub.L. No. 2–2005, § 86 resolved conflicting versions of this section.

equitable subrogation with respect to a lien may not be denied equitable subrogation solely because:

(1) the mortgagee:

 (A) is engaged in the business of lending; and

 (B) had constructive notice of the intervening lien over which the mortgagee seeks to assert priority;

(2) the lien for which the mortgagee seeks to be subrogated was released; or

(3) the mortgagee obtained a title insurance policy.

(e) Subsection (d) does not apply to a municipal sewer lien under IC 36–9–23 or a mechanic's lien under IC 32–28–3–1.

Thus, Washington Mutual could not be denied equitable subrogation simply because it obtained title insurance. Gibson argues, and the Neus concede, that this statute would apply to Washington Mutual as a mortgagee but not to the Neus as purchasers. However, the Neus argue that the statute "reflects a broad policy determination that neither buyers nor lenders should be denied equitable subrogation simply because they obtained title insurance." Appellee's Brief at 22. Given the "liberal application" of equitable subrogation, we agree. *Nally*, 820 N.E.2d at 652.

We conclude that the trial court did not err by granting the Neus and Washington Mutual equitable subrogation to the extent of the Irwin mortgage. Moreover, this result is consistent with Illustration 21 of the comments to the Restatement (Third) of Property: Mortgages § 7.6, which provides:

 21. Mortgagor holds Blackacre subject to two mortgages, held respectively by Mortgagee–1 and Mortgagee–2. Mortgagor sells Blackacre to Grantee, falsely stating to Grantee that Blackacre is subject only to the first mortgage and promising that Mortgagor will pay and satisfy that mortgage obligation with the proceeds of the sale. Grantee, believing this statement, makes no title examination and is unaware of the existence of the second mortgage. Grantee completes the purchase. Mortgagor uses the proceeds of the sale to satisfy the first mortgage but does not satisfy the second. Grantee is entitled to be subrogated to the rights of Mortgagee–1 as against Mortgagee–2 and may enforce the first mortgage against Mortgagee–2.

\* \* \* \* \* \*

Illustration 21 states that the grantee lacks knowledge of the intervening lien. However, knowledge is not necessarily fatal to the grantee's claim of subrogation, if equity would nonetheless dictate the recognition of subrogation. See the discussion in Comment *e*, infra. Moreover, the grantee's right to subrogation is not lost even if the second mortgage was recorded and the grantee might be held to have had constructive notice of it under the applicable recording act. Although the grantee may have examined the title carelessly or may have made no title examination at all, if the cash price paid by the grantee included the second mortgage balance, subrogation to, rather than extinction of, the first mortgage will result in order to prevent unjust enrichment of the second mortgagee.

In summary, we conclude that the trial court erred by granting summary judgment to the Neus and Washington Mutual regarding the release of Gibson's mortgage. However, we conclude that the trial court properly granted the Neus and Washington Mutual equitable subrogation over Gibson's mortgage. *See, e.g., Nally,* 820 N.E.2d at 655.

For the foregoing reasons, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

SULLIVAN, J., and CRONE, J., concur.